IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
IN ADMIRALTY

2004 SEP 24 PM 3:46

JAMES R. WATSON,
and
Carolyn WATSON,
his wife, Plaintiffs,
-vs.-

C.A. No. 04-1298

OCEANEERING
INTERNATIONAL, INC.

JURY TRIAL
DEMANDED

Defendant.

## VERIFIED COMPLAINT

Comes now, the Plaintiff, James R. Watson by and through his attorney, PETER E. HESS, Esq. and alleges and avers as follows:

1) This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appear, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2) This is a seaman's action for personal injury brought pursuant to the Jones Act, 46 U.S.C. §688. Pursuant to 28 U.S.C. §1916, a seaman is entitled to bring this action without prepayment of costs, fees or the furnishing of security by the plaintiff.

### I. The Parties

3) James R. Watson ("Watson") is a domicile of the State of Utah whose residence is at 2241 South Canela Circle, Washington, Utah 84780.

4) Oceaneering International, Inc. ("Oceaneering") is a Delaware Corporation with its principal place of business in Texas.

1

## II. Juridiction and Venue

5) Plaintiff Watson is a merchant seaman and, prior to the facts set forth below, was for 12 years the Second Mate of Oceaneering's vessel *PERFORMER*. Watson fell severely ill to the point of nearly dying in the course of maritime employment while in Defendant's employ aboard *PERFORMER*. Plaintiff's maladies were caused by and/or severely exacerbated by the Defendant's negligence and the unseaworthiness of said vessel. Therefore, federal jurisdiction exists under maritime jurisdiction provided in the United States Constitution, Article III, §3 and the Jones Act, 42 U.S.C. §688.

6) Defendant Oceaneering is incorporated in Delaware. Its Registered Agent in the State of Delaware is the Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

## III. The Facts

7) On or about September 25, 2001, Plaintiff Watson was employed by Defendant Oceaneering as the Second Mate aboard Defendant's vessel, *PERFORMER*. Tasman remained in Defendant's employ until discharged in 2002.

8) On or about September 26, 2001, while at sea in the western Mediterranean, Plaintiff experienced severe epigastric pain characterized by multiple daily episodes of hematemesis (vomitting blood) and melena (bloody stools). Watson had no prior history of these symptoms. The severity of his condition confined Watson to his quarters, unable to eat. Watson's condition continued to worsen and within two days he was unable to walk. No intravenous nourishment was provided Watson.

9) Finally, with Watson close to death, Oceaneering evacauted the Plaintiff by helicopter to a hospital in Majorca, Spain. Watson remained in intensive care in the Spanish hospital for nearly two weeks. When he arrived, Watson was near death from loss of blood; he was suffering from pneumonia and severe dehydration as well. The underlying condition which had apparently triggered the cascading chain of medical events was diagnosed as a pseudocyst of Watson's pancreas.

10) On October 14, 2001, Watson was given a LifeLift to the United States where he was brought to St. Luke's Hospital in Houston, Texas. Watson remained in intensive care for almost another full month, being discharged to the hospital's rehabilitation center on Novemeber 8th and discharged on November 27th.

11) Watson returned with his wife to Utah for further convalesence but his condition quickly worsened again. On December 12, 2001, Watson was hospitalized at the Dixie Regional Medical Center in St. George, Utah, still suffering from the pseudocyst of the pancreas. Although Watson was discharged within several days with a stomach drainage tube and external bag, at home he grew steadily weaker and was rehospitalized on January 14, 2002.

12) Upon reexamination of Watson, it was found that his stomach-draining tube had punctured his colon, causing extensive abdominal injuries and infections. A perforated stomach lining was diagnosed as well. Watson was fitted with an iliostomy bag and forced to endure four separate drainage tubes to draw pus from his stomach. He did not return home until February, 2002; on the 14th of that month, Watson was outfitted with a permanent IV in his right arm to administer a heavy dose of antibiotics to kill his persistent internal infections. This IV was not removed until May, 2002.

13) Watson's treating physician concluded that all of his maladies and medical complications were a direct and proximate result of his orginal shipboard illness and Oceaneering's failure to promptly and properly respond to his obvious medical emergency.

## COUNT ONE:
## MAINTENANCE AND CURE

14) Plaintiff realleges all preceding paragraphs.

15) Because Watson's maladies manifested themselves in the course of maritime employment with Defendant, Oceaneering owes Watson maintenance and cure, to wit, weekly payments covering the Plaintiff's living expenses and payment of all medical bills and treatment related to said injuries until such time as Watson has been diagnosed by his treating physician as having reached maximum medical cure.

16) Watson has not yet reached maximum medical cure.

17) Watson has been totally disabled by his maladies, illnesses and their consequences; he was forced to retire from Oceaneering against his will and has been unable to return to maritime or any other employment since the onset of his maladies.

18) In spite of numerous demands to do so, Oceaneering has failed to honor its obligation to pay Watson's outstanding medical bills. Defendant's refusal to make ongoing payments of maintenance and medical expenses is unreasonable and recalcitrant. Therefore, Defendant also owes the Plaintiff reasonable attorney's fees.

4

WHEREFORE, Plaintiff asserts a claim for maintenance and cure as well as reasonable attorney's fees against the Defendant Oceaneering.

## COUNT TWO:
## JONES ACT NEGLIGENCE

19) Plaintiff realleges all preceding paragraphs.

20) Because of the Jones Act negligence of Defendant Oceaneering, Inc. in failing to promptly and properly respond to Watson's life-threatening medical emergency, Plaintiff sustained and/or endured the maladies heretofore alleged, physical and emotional pain and suffering and the loss of income. Watson has also sustained permanent impairment to his earning capacity.

WHEREFORE, Plaintiff asserts damages against the Defendant for its Jones Act negligence.

## COUNT THREE:
## UNSEAWORTHINESS

21) Plaintiff realleges all preceding paragraphs.

22) Defendant's vessel *PERFORMER* was unseaworthy because it did not have properly trained medical personnel onboard nor did the vessel or its crew promptly and properly respond to Watson's life-threatening medical emergency.

23) As a direct and proximate consequence of the unseaworthiness of *PERFORMER*, Plaintiff sustained the exacerbation of the maladies heretofore alleged, physical and emotional pain and suffering and loss of income. Watson's injuries are permanent; he has also sustained permanent impairment to his earning capacity.

WHEREFORE, Plaintiff claims damages against the Defendant for the unseaworthiness of its vessel.

## COUNT IV:
## LOSS OF CONSORTIUM

24) The Plaintiffs incorporate and re-allege allegations 1)-23).

25) This is an action for Carolyn Watson's loss of consortium.

26) Carolyn Watson, the wife of James K. Watson, lost the services and support of, and any conjugal relationship with, her husband since his September 25, 2001 illness and its subsequent medical complications.

27) The ensuing financial and emotional hardship of the Watson family has wrought an appreciable diminution in the family's standard of living.

WHEREFORE, Carolyn Watson prays for a finding of her loss of the consortium of her husband, James, and for the imposition of a judgment on her behalf for this loss and the attendant loss to her and her family of the financial, physical and emotional support of her husband and such other relief as may be just and reasonable.

September 24, 2004
Dated

Respectfully submitted,

PETER E. HESS, Esq.
3 Mill Road, Suite 303
Wilmington, DE 19806
ph: (302) 777-1715
DE Bar No. 2298

ATTORNEY FOR
PLAINTIFF JAMES R.
WATSON

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
IN ADMIRALTY

JAMES R. WATSON,
and
Carolyn WATSON,
his wife, Plaintiffs,
-vs.-                                               C.A. No.

OCEANEERING
INTERNATIONAL, INC.                                 JURY TRIAL
                                                    DEMANDED
Defendant.

### VERIFICATION

The Plaintiff, James R. Watson, having been made aware fo the penalties against perjury, hereby avers that the facts as set forth in the attached Complaint, are to the best of his knowledge, true and correct.

_September 24, 2004_
Dated

_James R. Watson by_ /s/
JAMES R. WATSON

# MEDICAL FACULTY ASSOCIATES
## THE GEORGE WASHINGTON UNIVERSITY

MICHAEL J. MANYAK, M.D.
PROFESSOR OF UROLOGY, MICROBIOLOGY, AND TROPICAL MEDICINE
CHAIRMAN

FREDERICK R. HENDRICKS, M.D., MPH
PROFESSOR

RAMEZ ANDRAWIS, M.D.
ASSISTANT PROFESSOR

STEVEN R. PATIERNO, PH.D.
PROFESSOR OF UROLOGY,
PHARMACOLOGY, AND GENETICS
DIRECTOR, MOLECULAR AND
CELLULAR ONCOLOGY PROGRAM

ANN W. HSING, PH.D
PROFESSOR
SENIOR INVESTIGATOR
DIVISION OF CANCER
EPIDEMIOLOGY AND GENETICS
NATIONAL CANCER INSTITUTE

LADAN ZOLFAGHARI, M.D.
RESEARCH AND RESIDENCY COORDINATOR

PEDIATRIC UROLOGY
H. GILFORD RUSHTON, M.D.
PROFESSOR AND CHIEF

A. BARRY BELMAN, M.D.
PROFESSOR

HANS G. POHL, M.D.
ASSISTANT PROFESSOR

August 23, 2004

Peter E. Hess, Esq.
3 Mill Road
Suite 303
Wilmington, DE 19806

Re:   James Watson v Oceaneering International, Inc.

Dear Mr. Hess:

Thank you for the opportunity to review the records in the above case regarding the medical management of the problems encountered by this seaman while at sea. As you know, as a Director of The Explorers Club and Chairman of the Expeditions Committee, I am often consulted about remote medical issues including the need for proper evacuation in case of an adverse medical event. My longstanding background in expedition medicine includes management of problems at sea in the Philippines, in the North Atlantic as the medical director for the RMS Titanic salvage expedition, and my interaction with the FEMA and remote medical team at The George Washington University which manages medical emergencies globally for the US Merchant Marine fleet. Furthermore, I was an invited speaker by NASA at 3 workshops and an author of the manuscript on public policy for extreme medicine currently in press arising from those meetings.

Mr. Watson was a 66 year old male at the time of the onset of severe epigastric pain on September 25, 2001, and was apparently briefly seen by a physician in Valencia, Spain, and prescribed unknown pills before embarkation. Mr. Watson had no significant medical history prior to the onset of the illness which manifested on September 26 as multiple episodes of hematemesis (vomiting blood) and melena (bloody stools). The patient could not eat. Although medical evacuation was requested, it was denied until October 2, 2001, when he was air evacuated to Mallorca, Spain.

SURGICAL SPECIALTIES PRACTICE GROUP
DEPARTMENT OF UROLOGY
2150 PENNSYLVANIA AVENUE, NW · WASHINGTON, DC 20037 · 202-741-3100 · FAX 202-741-3113

1

Upon arrival in Mallorca he was severely dehydrated and had very significant hemorrhage such that his hemoglobin was 6 g/dL (normal for a male is 14-18 g/dL). This value actually inflates his true hemoglobin status since he had intravascular hemoconcentration due to his lack of fluid replacement. Mr. Watson was in hypovolemic shock and was transfused 6 units of packed red blood cells (3000 ml of blood). An abdominal ultrasound noted hepatomegaly (enlargement of the liver) but no engorgement of the vessels of the liver. Ascites was noted around the pancreas but no evidence of gall stones or gall bladder infection was found. He underwent an emergency upper endoscopy to evaluate the source of his hemorrhage and was found to have a hiatal hernia with esophagogastric erosions. Of note, the patient was not found to have esophageal varices, a potential common cause of massive upper gastrointestinal hemorrhage.

Over the course of the next few days the patient continued to be unstable and was found to have a right pulmonary infiltrate consistent with pneumonia and air in the mediastinum which could be caused by a tear in the esophagus or rupture of a pulmonary bleb. He underwent an emergency thoracotomy, had part of his lower lung removed, and was placed on a ventilator. He also suffered from severe renal failure with a creatinine reaching 5.9 mg/dL resulting from his blood loss and sepsis. He also experienced cardiac arrhythmias. Cultures from his lung grew a Klebsiella species. During this time he was judged too ill to be evacuated to the US and was finally stabilized enough to be evacuated 12 days after arrival in Mallorca.

The findings in the medical records demonstrate that a potentially life-threatening gastrointestinal hemorrhage began on September 26 resulting in massive blood loss and renal failure. The record also strongly suggests that the pulmonary infiltrate resulted from aspiration pneumonia from his vomiting. Klebsiella organisms are the causative organism in 40% of cases of aspiration pneumonia. The lack of engorged liver blood vessels and lack of esophageal varices suggest that this hemorrhagic episode is not related to chronic alcohol consumption and subsequent cirrhosis though the hepatomegaly may be related to a previous or concurrent hepatitis. It would be highly unlikely that hepatitis would cause gastrointestinal hemorrhage. Frankly, Mr. Watson is very lucky to have survived this combination of severe hemorrhage, renal failure, and sepsis from pneumonia, any one of which could have killed him. The later appearance of peripancreatic ascites without previous history of pancreatitis or gall bladder disease points strongly to his gastrointestinal catastrophe as the cause which then led to formation of a large pancreatic pseudocyst and nearly fatal complication of infection with prolonged hospitalization. In essence, Mr. Watson survived 2 nearly fatal medical events related to the delay in receiving adequate medical care.

I discussed this case with both Rear Admiral Dr. Joyce Johnson, the very recently retired Surgeon General of the Coast Guard who refined their evacuation algorithms, and to Dr. James Marinucci, the Assistant Director of the Ronald Reagan Institute for Emergency Medicine who is highly involved with maritime medical evacuation and they both strongly emphasized that immediate evacuation was mandatory in this circumstance.

In conclusion, it is my opinion within reasonable medical probability that the delay in evacuation of this patient was negligent, was the direct cause of his extended problems, and twice nearly caused his death. Gastrointestinal hemorrhage is a true emergency and requires the sophisticated medical support of a fully-equipped hospital and corresponding medical specialists. Immediate evacuation is mandatory in these circumstances and failure to do so is negligent.

Sincerely,

Michael J. Manyak, MD, FACS
Professor of Urology, Microbiology, and Tropical Medicine
Chairman, Department of Urology

3

# MICHAEL J. MANYAK, MD

## Professional Biograph

Dr. Michael J. Manyak is Professor and Interim Chairman of the Department of Urology at The George Washington University Medical Center (GWUMC). Dr. Manyak is also Professor of Microbiology and Tropical Medicine at GWUMC. After Dr. Manyak completed his urological residency at GWUMC, he became an American Foundation For Urological Disease (AFUD) Scholar at the National Cancer Institute (NCI), completed a fellowship in biotechnology in 1988, and joined the urological staff at GWUMC. His research interests include the expression and regulation of a protein which inhibits metastasis, monoclonal antibody use for detection of prostate cancer metastasis, surgical simulation with virtual reality, and other applications of medical biotechnology.

Dr. Manyak was appointed to the Medicare Coverage Advisory Committee for the Center for Medicare and Medicaid Services (CMS) which determines Medicare reimbursement for all medical procedures and technologies. In addition to a presidential appointment to the National Kidney and Urological Disease Advisory Board, he has recently been appointed as a voting member of the FDA Regulatory Panel for Genitourinary and Gastrointestinal Devices. He has been a frequent reviewer for the NIH Special Study Section for Small Business Grants and several professional journals. Dr. Manyak served as Chairman of the AUA Technology Assessment Council and on 5 other national AUA Committees related to technology for 5 years. He has published over 150 professional abstracts, book chapters, and refereed journal articles, has been granted 10 patents with several pending, and is on the scientific advisory board or consultant to more than 20 biomedical technology companies. Dr. Manyak was profiled by the *Washingtonian Magazine* in December 2001 as one of 50 people selected as <u>The Best and Brightest of Washington</u>. *Family Urology Magazine* also profiled Dr. Manyak in April 2003. In addition, Dr. Manyak has been inducted into the Greater Flint Michigan Sports Hall of Fame (1996) and the State of Michigan High School Athletic Association <u>Legends of the Game</u> (2004).

Dr. Manyak was the Managing Medical Editor of the nationally-acclaimed Time-Life Medical Publications prostate cancer educational video and the Medical Editor for the Public Broadcasting Corporation (PBS) video *Check It Out* which received both the Creative Excellence Award at the US International Film and Video Festival and a National Media Owl Award in 1997. Dr. Manyak is the medical editor for the Virtual Prostate website that received the Gold World Wide Web Health Award in 2004. He is a urologic consultant to *Mens Health Magazine* and a frequent media contact on behalf of the AUA. He has numerous appearances on national networks for CBS, NBC, Fox News, PBS, and CNN and has been the guest of John McLaughlin on *One On One*.

Dr. Manyak is a founder of Metastatin Pharmaceuticals, Inc., and is a founder and director of MED-GARD, Inc., which provides charitable medical services in remote underserved areas. Dr Manyak is a consultant to several journalists and members of the National Geographic Society, NPR Radio Expeditions, and *USA Today* for travel medical issues and is the urologic consultant to the Peace Corps. Recently, Dr. Manyak was appointed by NASA to the Aerospace Medicine and Occupational Health Advisory Committee.

Dr. Manyak maintains an avid interest in field exploration and expedition medicine. He was selected as a Fellow National of The Explorers Club in 1992, has chaired the Expeditions Committee since 1995, and was appointed to the Science Advisory Board in 1997 which he now chairs. He has served on The Explorers Club Board of Directors since 1996. His column on Expedition Medicine has appeared in the *Explorers Journal*. Dr. Manyak received the prestigious Sweeney Medal in 2004 from The Explorers Club. Since 1990 Dr. Manyak has been the Field Medical Advisor to the International Society of Cryptozoology (ISC) which investigates unknown or undescribed animals throughout the world. Dr. Manyak has led a scientific expedition to the Ndoki rain forest in the Congo Basin in a collaborative effort with the World Wildlife Fund, has dived the Spanish galleon *Nuestra Senora de Atocha* in search of artifacts, and was the medical director for the *RMS Titanic* salvage expedition in 2000 and dove to the Titanic wrecksite in the Russian MIR submersible.